IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,239

NORTHERN NATURAL GAS COMPANY,
*Appellant*,

v.

ONEOK FIELD SERVICES COMPANY, LLC; ONEOK MIDSTREAM GAS SUPPLY, LLC;
LUMEN ENERGY CORPORATION; and LUMEN MIDSTREAM PARTNERSHIP, LLC,
*Appellees,*

v.

NASH OIL & GAS, INC. and L.D. DRILLING, INC.,
*Appellees,*

and

VAL ENERGY, INC.,
*Intervenor/Appellee.*

SYLLABUS BY THE COURT

1.

Once the Kansas Corporation Commission or Federal Energy Regulatory Commission approves its certification, a natural gas public utility's identifiable non-native storage gas lying underneath a natural gas storage facility's certificated boundaries is no longer subject to the common-law rule of capture—even if the utility has not yet acquired storage rights through eminent domain or contract.

2.

A court of last resort will follow the rule of law established in its earlier cases unless clearly convinced the rule was originally erroneous or is no longer sound because of changing conditions and more good than harm will come by departing from precedent.

1

Appeal from Pratt District Court; FRANCIS E. MEISENHEIMER, judge. Opinion filed September 6, 2019. Reversed and remanded.

*Richard A. Olmstead*, of Kutack Rock LLP, of Wichita, argued the cause and was on the briefs for appellant Northern Natural Gas Company.

*James M. Armstrong*, of Foulston Siefkin LLP, of Wichita, argued the cause on behalf of all appellees, and *Jim H. Goering* and *Daniel J. Buller*, of the same firm, and *Larry E. Keenan* and *Timothy R. Keenan*, of Keenan Law Firm, P.A., of Great Bend, were with him on the brief for appellee L.D. Drilling, Inc.

*Robert R. Eisenhauer*, of Johnston & Eisenhauer, of Pratt, and *Brad Welsh*, pro hac vice, of Gable & Gotwals, of Tulsa, Oklahoma, were on the brief for appellees ONEOK Field Services Company, LLC and ONEOK Midstream Gas Supply, LLC.

*Robert Christensen*, of Law Office of Robert W. Christensen, of Medicine Lodge, and *Mark Banner*, pro hac vice, of Hall Estill, of Tulsa, Oklahoma, were on the brief for appellees Lumen Energy Corporation and Lumen Midstream Partnership, LLC.

*Brian J. Madden*, of Wagstaff & Cartmell, LLP, of Kansas City, Missouri, was on the brief for appellee Nash Oil & Gas, Inc.

*Jeffery L. Carmichael* and *Will B. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, were on the brief for appellee Val Energy, Inc.

*David G. Seely*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, was on the brief for amicus curiae Eastern Kansas Royalty Owners Association, and *Gregory J. Stucky*, of the same firm, was on the brief for amicus curiae Southwest Kansas Royalty Owners Association.

The opinion of the court was delivered by

BILES, J.: Northern Natural Gas Company injects into underground storage reservoirs large quantities of previously produced natural gas acquired from distant locations so it can remove, transport, and resell that gas later during peak market conditions. Some of its storage gas migrated beneath the earth to nearby wells in areas Northern did not control through eminent domain or contract. The wells' operators extracted that gas and sold it. A legal struggle has waged for more than a decade over the disputed right to produce Northern's migrated storage gas. This is yet another round in that high-dollar subsurface prize fight.

In a previous appeal, we applied the common-law "rule of capture" to conclude the operators lawfully produced and sold Northern's storage gas taken before June 2, 2010. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 296 P.3d 1106 (2013) (*ONEOK I*). That was the date when Northern received a certificate from the Federal Energy Regulatory Commission permitting it to expand the authorized boundaries of its then-existing underground storage field to encompass the offending wells. We now consider whether that certification changes the right-to-produce analysis for gas taken after June 2, 2010. We hold it does.

Once those new boundaries were certified, Northern's identifiable storage gas within that designated area was no longer subject to the rule of capture—even though Northern had not yet acquired storage rights through eminent domain or contract. See *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 88, 774 P.2d 962 (1989) ("[A]s soon as Union's storage operation became authorized and its gas identifiable, the gas was no longer *ferae naturae* and subject to the rule of capture. The title to Union's captured gas remained in Union."). The district court erred when it granted judgment against Northern by holding otherwise. We reverse and remand to the district court for further proceedings.

3

As mentioned, state and federal courts have wrestled with this controversy before. The facts and interrelated procedural twists are detailed in other court decisions. See, e.g., *ONEOK I*, 296 Kan. at 911-16; *Northern Natural Gas Co. v. L.D. Drilling*, 862 F.3d 1221 (10th Cir. 2017), *cert. denied* 138 S. Ct. 747 (2018); *Northern Natural Gas Co. v. Appx. 9,117 Acres in Pratt*, No. 10-1232-MLB-DWB, 2015 WL 471244 (D. Kan. 2015). For our purposes, the relevant facts can be concisely described.

Northern has an underground natural gas storage facility known as the Cunningham Storage Field in Pratt and Kingman counties. Northern holds certifications from the Kansas Corporation Commission and FERC to inject and store previously produced natural gas that is transported to the Field to await favorable market conditions and resale. Nash Oil & Gas, Inc. and L.D. Drilling, Inc. operated oil and gas wells about two to six miles from the Field's northern certificated boundary as it existed before June 2, 2010. ONEOK and Lumen were third-party purchasers of gas produced by Nash and L.D.

In 2008, Northern sued Nash, L.D., and another producer, Val Energy, Inc., in the United States District Court for the District of Kansas, alleging they aggravated the subsurface movement of Northern's storage gas beyond the Field's then-certificated boundaries by pumping atypical quantities of water to create artificial pressure sinks. This, the allegation continued, drew Northern's storage gas from the Field toward the producers' wells, where it was extracted and sold.

While that federal litigation progressed, Northern filed this state lawsuit in Pratt County District Court against ONEOK and Lumen alleging they participated in converting Northern's storage gas by buying it from Nash and L.D. Its conversion claims state:

4

"43. Producers have produced and sold, and will continue to produce and sell Northern's previously injected storage gas which migrated on or after July 1, 1993.

"44. Northern holds title to, and is the lawful owner of, all such previously injected, but migrated storage gas.

"45. Based upon belief and recently acquired information and data, [ONEOK and Lumen] *have purchased from the Producers*, or caused others to purchase from the Producers, such migrated storage gas and, upon information and belief, transported and re-sold such migrated storage gas.

"46. [ONEOK's and Lumen's] acts and/or omissions, including, but not limited to, purchasing, transporting, and reselling Northern's migrated storage gas constitute the unauthorized exercise of ownership rights by [ONEOK and Lumen] over Northern's migrated storage gas, to the exclusion of Northern's rights.

. . . .

"48. [ONEOK's and Lumen's] *unauthorized exercise of ownership and control over Northern's storage gas . . . is an unlawful conversion.*" (Emphases added.)

In response, ONEOK and Lumen admitted purchasing gas from Nash and L.D., denied Northern's conversion allegations, and asserted third-party indemnification claims against Nash and L.D. as a precaution against the conversion claims. ONEOK and Lumen insisted they were innocent good-faith purchasers for value; and "[a]s a matter of public policy, innocent purchasers of previously injected storage gas can have no liability for conversion because purchasers must be entitled to rely upon the assurances of title made by sellers."

Nash and L.D. moved for summary judgment, asserting a legal right to produce the migrated gas from their wells. They noted the Underground Storage of Natural Gas

Act, K.S.A. 55-1201 et seq., sets out circumstances when natural gas public utilities can acquire property rights through condemnation for underground natural gas storage and addresses ownership of storage gas migrating outside a designated area. But, they argued, the Storage Act did not apply to the migrated gas they took and this statutory gap left in place common-law principles permitting their operations.

The district court granted the motion, ultimately resolving not only ONEOK and Lumen's third-party claims against Nash and L.D., but also Northern's conversion claims against ONEOK and Lumen. The court agreed with Nash and L.D. that the Storage Act did not apply because it expressly dealt only with gas that "migrated *to adjoining property* or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased." (Emphasis added.) K.S.A. 55-1210(c). And because the producers' wells were not on land adjoining the Field, the court held the common-law rule of capture applied and allowed Nash and L.D. to produce and sell migrated storage gas taken from their wells.

Shortly thereafter, FERC issued the June 2, 2010 certificate authorizing Northern to expand the Field's boundaries. The FERC order gave Northern authority to acquire rights to property within the newly certificated boundaries. This effectively extended Northern's buffer zone to better protect its migrating gas from capture by others.

The FERC certification caused the district court to modify its judgment to limit its application to the time before June 2, 2010. The court also ordered ONEOK and Lumen to suspend payments to Nash and L.D. for gas produced from their wells until further court direction.

On appeal, the *ONEOK I* court affirmed the district court's ruling. It then remanded the case to resolve "any remaining claims that may exist regarding matters

6

after June 2, 2010, and for resolution of the district court's standing order requiring ONEOK and Lumen to suspend payments to Nash and L.D." *ONEOK I*, 296 Kan. at 942.

Meanwhile, with the *ONEOK I* appeal pending, Northern began condemnation in the United States District Court for the District of Kansas for storage rights in the expansion area authorized by the June 2, 2010 certification. *Northern Natural Gas v. 9117.53 Acres in Pratt,* 781 F. Supp. 2d 1155, 1158-59 (D. Kan. 2011). The date of taking was set as March 30, 2012. The federal court ordered Northern to pay $8.5 million for the condemned property rights. Much of that award resulted from the federal district court's vigorously disputed decision to value Northern's migrated storage gas lying "in place" underneath the condemned land. *Northern Nat. Gas v. 9117 Acres in Pratt, Kingman*, 2 F. Supp. 3d 1174, 1187 (D. Kan. 2014).

Back in the state district court after our *ONEOK I* remand to consider the storage gas taken by the producers after June 2, 2010, Northern narrowed its claims to only the gas taken from within the expansion area and filed what it styled as a motion for partial reconsideration, essentially arguing for a different result for the post-certification gas. The district court denied the motion, finding Northern did not own the storage gas produced from the expansion area before the March 30, 2012 taking date set in the federal condemnation lawsuit. It reasoned Northern did not control the area where the wells were located until the date of taking.

It is important to note that two weeks before the state district court denied Northern's reconsideration, the United States Court of Appeals for the Tenth Circuit reversed a substantial part of the federal condemnation award. The circuit court held the lower federal court erred by including the value of Northern's "in place" migrated storage gas under the landowners' property on the date of taking. *L.D. Drilling*, 862 F.3d at 1231-32 (holding Northern owned all storage gas within certified field boundaries after the certification date). Nevertheless, the state district court did not revise its judgment, or

7

even mention the Tenth Circuit ruling, despite the federal appeals court's obvious contradictions with the state district court's right-to-produce rationale for the post-June 2, 2010 storage gas issue, as well as a related question about whether landowners would suffer an unconstitutional taking. See 862 F.3d at 1227-28 ("We disagree with the inclusion of the value of storage gas in and under the Extension Area on the date of taking because we find that the Landowners and Producers *had no right to produce such gas after the date of certification*." [Emphasis added.]).

The district court certified its decision as a final order under K.S.A. 2010 Supp. 60-254(b). Northern timely appealed. We granted a motion to transfer the controversy to our court. Jurisdiction is proper. See K.S.A. 60-2101(b) (providing Supreme Court jurisdiction over appeals transferred under K.S.A. 20-3017).

NO RIGHT TO CAPTURE STORAGE GAS AFTER JUNE 2, 2010

Our question is whether the producers could take Northern's migrated non-native storage gas from wells located within the newly certified boundaries for the storage field after June 2, 2010. On summary judgment, the district court concluded the producers had that right under the common-law rule of capture. We disagree.

*Standard of review*

> """'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable

8

minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied."'" [Citation omitted.]" *Trear v. Chamberlain*, 308 Kan. 932, 935-36, 425 P.3d 297 (2018).

There are no material facts in dispute as to the issue on appeal, so we are presented with a straightforward legal question. Our review is de novo as to the legal effect of the undisputed facts. *ONEOK I*, 296 Kan. at 918.

*Discussion*

It is necessary for clarity to revisit some long-standing Kansas legal principles affecting natural gas and its underground storage. This has been covered to some extent in recent caselaw. See, e.g., *ONEOK I*, 296 Kan. at 919-24; *Northern Natural Gas Co. v. Martin, Pringle, et al.*, 289 Kan. 777, 788-91, 217 P.3d 966 (2009). A few applicable principles date back more than 100 years.

In *Anderson v. Beech Aircraft Corp.*, 237 Kan. 336, 699 P.2d 1023 (1985), the court described the economic desirability and legal entanglements inherent in the commercial practice of injecting non-native natural gas back into the ground for storage—after it has already been produced, purchased, and transported from another location—in this way:

> "[T]he concept of underground storage of natural gas has become well accepted in the natural gas industry. Today, natural gas is being stored in underground reservoirs in most of the gas producing states. This tremendous increase in gas storage was the result of the increased demand for, and popularity of, natural gas as a consumer fuel. The demand for natural gas far exceeded the supply, and pipelines proved incapable of supplying peak consumer demands which were mainly caused by cold weather. During periods of lesser demand, the pipelines could transport more than enough gas. Above ground storage of gas was impossible. It simply was not economically feasible to fabricate containers large enough to serve all consumers. Experience proved that the problem of meeting peak

9

consumer demands for natural gas could be solved only by the use of underground storage of gas. It became obvious that depleted oil and gas fields could be effectively converted into vast storage containers. However, suitable formations for underground storage of natural gas do not exist in all states. A formation must possess a high degree of porosity in order to accommodate large quantities of gas and must also possess a high degree of permeability to allow the gas to be injected and withdrawn rapidly. In addition to these basic requirements, the formation must be sufficiently sealed geologically to prevent migration of the injected gas.

"With the underground storage of natural gas, there developed many legal problems involving the interrelationship between a gas company or a storage operator and the owners of land or mineral interests included within the storage reservoirs. These include competing claims asserting ownership of injected gas and ownership of the storage formation. One problem was the matter of the title to the non-native gas injected in an underground reservoir for storage. Other problems were concerned with the acquisition of the necessary stratum and surface land for the storage reservoir and the relative rights of the owner of the fee and the owner of a mineral interest which had previously been severed from the surface interest. Problems have also arisen in regard to the method of acquisition. One method involves voluntary acquisition by contract between the gas company and the landowners. The other alternative is the exercise of the power of eminent domain. There have been complications arising because of state regulation and also federal regulation and the conflicts arising therefrom. Finally, there has been the problem of income tax considerations as between the parties granting storage rights and the party acquiring storage rights. Some of these problems have come before the courts and some have not. They are mentioned to show the complexity of the problems arising from the injection of non-native gas into the earth for underground storage. [Citation omitted.]" 237 Kan. at 340-42.

Before 1951, a natural gas public utility lacked the power to condemn subsurface property to create an underground storage facility. See *Strain v. Cities Services Gas Co.*, 148 Kan. 393, 397, 83 P.2d 124 (1938) ("The use of the earth as a storage place for gas is an idea so novel we cannot believe the legislature had such matter in contemplation when the power of eminent domain was given to pipe-line companies."). The Storage Act came

10

into being to facilitate and promote this commercial activity. See K.S.A. 55-1202 (underground natural gas storage is in the public interest).

The Storage Act, enacted in 1951, established procedures for a natural gas public utility to use eminent domain to acquire subsurface property rights for underground storage facilities. K.S.A. 55-1201; K.S.A. 55-1205. Notably, K.S.A. 55-1205 provided, "The appraisers in awarding damages hereunder shall also take into consideration the amounts of recoverable oil and *native gas* remaining in the property sought to be appropriated . . . ." (Emphasis added.) "Native gas" is defined as gas not previously withdrawn from the earth. K.S.A. 55-1201(c). In other words, the statute did not require valuing non-native storage gas lying beneath the landowner's condemned property.

Northern is a natural gas public utility engaging in transporting and distributing natural gas within or through Kansas for public use. It is undisputed Northern is eligible to invoke the Storage Act's provisions and protections. Storage gas is statutorily described as natural gas previously reduced to possession and then later injected into underground storage fields. K.S.A. 55-1210(a).

When first enacted, the Storage Act was silent about how it related to the previously mentioned common-law rule of capture. Court decisions filled in some gaps case-by-case based on historical common-law principles for oil and gas. We review those historical principles first, then return to their application to underground storage of previously produced natural gas.

Generally, the peculiar migratory characteristics of oil and gas resulted in developing the rule of capture in the common law. 1 Kuntz, Law of Oil & Gas, § 2.4. (1987) ("Because the rights in oil and gas were subject to being lost by drainage from operations on other land, it was difficult to describe in conventional property terms, the nature of the rights to the oil and gas before capture."). In states such as Kansas, the rule

11

of capture operates as a corollary to the ownership-in-place theory that recognizes ownership in oil and gas in the ground as part of the land. 1 Kuntz, Law of Oil & Gas, § 2.4. (1987) ("According to the ownership-in-place theory, the landowner owns all substances, including oil and gas, which underlie his land. Such ownership is qualified, however, in the case of oil and gas, by the operation of the law of capture. If the oil and gas depart from beneath the owned land, ownership in such substances is lost."); see *Zinc Co. v. Freeman*, 68 Kan. 691, 696, 75 P. 995 (1904) ("Petroleum and gas, so long as they remain in the ground, are a part of the realty. They belong to the owner of the land, and are a part of it as long as they are on it, or in it, or subject to his control. When they escape and go into other lands, or come under another's control, the title of the former owner is gone.").

Under the rule of capture, if oil or gas migrated from the owner's property, title would pass to anyone who produced or "captured" that migrated gas, so long as that person was acting within the person's right to do so, such as a nearby landowner with a well properly bottomed on the landowner's property. The rule of capture made migrated native gas the personal property of the first person who produced it. *ONEOK I*, 296 Kan. at 919; see also 1 Kuntz, Law of Oil & Gas, § 4.1 (1987) (the nearby landowner "owns the substance absolutely once it has been reduced to dominion and control"); 1 Summers, Oil and Gas § 3:2 (3d ed. 2015) ("The rule of capture states that a mineral interest owner in a common source of oil and gas supply is legally privileged to take oil and gas from under the land, even though in so doing they may take some of the oil or gas from under adjoining lands.").

In Kansas, the rule of capture dealt initially with native oil and gas that migrated from another's property. In other words, it applied to the original capture of native gas. *Mobil Exploration & Producing U.S. Inc. v. Kansas Corporation Comm'n*, 258 Kan. 796, 800, 908 P.2d 1276 (1995) ("[T]he common-law rule of capture applies to a common pool. At common law, the owner of a tract of land acquired title to the oil and gas which

12

the owner produced from wells drilled thereon even though it could have been proved that part of such oil or gas migrated from adjoining lands."); *Carlock v. Krug*, 151 Kan. 407, 411, 99 P.2d 858 (1940) ("It is well settled in Kansas that the owner of the land and those holding under him own all the oil produced from wells located on the land and that owners of adjoining tracts must protect themselves by development of their own land."); *Prewett v. Van Pelt*, 118 Kan. 571, 576, 235 P. 1059 (1925) ("The rule seems to be that when one drills a gas or oil well on his premises he becomes the owner of all the oil and gas produced therefrom.").

The rule of capture and the ownership-in-place theory coexist, but obviously are not the same. And in the context of injected non-native storage gas, there is tension because the ownership-in-place theory considers gas to be personal property once severed from the land. As we will see, our caselaw joined a line of cases rejecting an approach in which injected gas always remained the injector's personal property in favor of the rule of capture, which perhaps in the case of storage gas is better termed a rule of "*re*capture." See Treadway, *Oil & Gas Law—The Rule of Capture Applied to the Underground Storage of Natural Gas—Anderson v. Beech Aircraft Corp.*, 34 U. Kan. L. Rev. 801, 815 (1986).

In 1985, the *Anderson* court considered for the first time whether the rule of capture applied to a corporation's injected non-native gas originally produced elsewhere and returned to the earth for storage for its own business use. *Anderson*, 237 Kan. at 342. There, Beech Aircraft, which was not a natural gas public utility, used a depleted subsurface formation to store non-native gas. That formation was underneath Beech Aircraft's property and Anderson's property, but Beech Aircraft did not have Anderson's permission for the subsurface storage. The court held the Storage Act did not apply because its protections were available only to a natural gas public utility, so the court resorted to the common-law rule of capture. 237 Kan. at 347.

13

In doing so, the *Anderson* court engaged in a detailed discussion of out-of-state cases about the rule of capture as well as an alternative that preserved an injector's title in non-native storage gas wherever it roamed. 237 Kan. at 342-45; cf. 237 Kan. at 344 (noting rule of capture criticized by some as "illogical and invalid for the reason that once man has reduced natural gas to possession, and processed and transported it to the storage area, the gas in no way resembles gas in its natural state").

To show the alternative, the *Anderson* court cited *White v. New York Natural Gas Corporation*, 190 F. Supp. 342 (W.D. Pa. 1960), and *Lone Star Gas Company v. Murchison*, 353 S.W.2d 870 (Tex. Civ. App. 1962), in which the courts held title to natural gas once reduced to possession was not lost by injecting that gas into an underground storage facility even though it migrated elsewhere, rejecting the "wild animal" analogy known as mineral *ferae naturae* that underlies the rule of capture. *Anderson*, 237 Kan. at 344-45. Stated differently, these courts held oil and gas, once severed from realty, became personal property and remained so unless abandoned. *Lone Star*, 353 S.W.2d at 879; see also *White*, 190 F. Supp. at 347.

After comparing the different legal approaches, the *Anderson* court determined for Kansas that the rule of capture should apply to non-native gas injected into the common pool for storage. *Anderson*, 237 Kan. at 347. The court reasoned it was best to stick with the traditionally followed rule to effectuate what the court perceived as legislative intent to limit the Storage Act's protections to natural gas public utilities. 237 Kan. at 348. The court further held Beech Aircraft lost title when it used Anderson's property for gas storage without permission and that injected non-native gas was then produced from the common reservoir located under Anderson's property. 237 Kan. at 348. But in so holding, the court cautioned that its decision was limited to circumstances when a natural gas utility was not involved, no certificate authorizing an underground gas storage facility had been issued, and when a landowner had used an adjoining landowner's property for storage without authorization or consent. 237 Kan. 336, Syl. ¶ 3.

14

The question relating to a natural gas public utility's ownership of migrated non-native gas withdrawn by a neighboring landowner after injection into a certificated storage facility presented itself four years later in *Union Gas System, Inc.*, 245 Kan. 80. Those circumstances yielded a more nuanced result by limiting how the rule of capture applied to storage gas injected by a natural gas public utility. There, Union had an underground facility, and its storage gas migrated to adjoining property. The neighboring landowners and their oil and gas lessee refused to grant storage rights and began taking Union's storage gas for themselves, believing the rule of capture permitted this. 245 Kan. at 83-84, 88. ("This created a clever circle of purloined production, and a successful one under the rule of capture as stated in *Anderson*."). Union sued to recover for the gas taken.

While the lawsuit was pending, Union received a regulatory certificate permitting it to condemn the landowners' property, and it began condemnation proceedings. 245 Kan. at 84; see K.S.A. 55-1204. This presented a legal question about how to treat the "purloined production" for Union's conversion claim for gas taken both before the certification date and after. 245 Kan. at 86, 88-89. The *Union Gas* court laid out lessons applicable to Northern's present controversy.

First, the court held Union was not entitled to recover for gas produced before the certificate issued. As to this period, the rule of capture applied under a straightforward application of *Anderson*. 245 Kan. at 86-87. But it reached a different result for storage gas taken after the certificate issued and before the condemnation's date of taking months later. 245 Kan. at 88 ("[T]he question remains as to [Union's] rights *to its own gas* from January 13, 1986, to April 9, 1987." [Emphasis added.]). The *Union Gas* court held:

> "Since Union established itself as a public utility and was authorized to store its gas underground by the Commission certificate issued on January 13, 1986, *it thereafter*

15

*acquired a changed status*. Its operation was given official sanction and its gas was identified. Thereafter *it became an exception to the rule of capture* expressed in *Anderson*." (Emphases added.) 245 Kan. at 88.

And since "[t]he law abhors a forfeiture," the *Union Gas* court explained,

"[A]s soon as Union's storage operation became authorized and its gas identifiable, the gas was no longer *ferae naturae* and subject to the rule of capture. *The title to Union's captured gas remained in Union.* Thus, Union did not forfeit its natural gas produced after January 13, 1986, [the certificate date,] even though it acquired no title to the [neighboring] property [through condemnation] until the date of taking, April 9, 1987." 245 Kan. at 88.

Importantly, while the *Union Gas* court sanctioned the lessee's production and sale of storage gas before the certificate date under the rule of capture, it held title to the storage gas produced after that date remained in Union—as if the injected gas' status as personal property was never lost, even though it migrated and was produced by someone else. The key features for this continuity of title were (1) an authorized storage operation, and (2) the ability to identify the storage gas. 245 Kan. at 88 ("So, as soon as Union's storage operation became authorized and its gas identifiable, the gas was no longer *ferae naturae* and subject to the rule of capture.").

With this approach, the *Union Gas* court adopted what amounted to the alternative rule discussed in *Anderson* that kept title in the storage gas with the injector. See *Anderson*, 237 Kan. at 344-45. But it did so only for non-native gas taken from wells located within the storage field's newly certificated boundaries where it would be clear the injector's intent was to retain ownership for retrieval on a later date. *Union Gas*, 245 Kan. at 88; see also 1 Kuntz, Law of Oil & Gas, § 4.1 (1987) ("The law of capture should be recognized for what it is, a rule of convenience and necessity used to strike a balance between protecting rights in oil and gas in place while preserving to another the fruits of

16

his industry."). *Union Gas* fixes the limits of the *Anderson* court's rule-of-capture approach when the unique circumstance is injected storage gas that is "no longer *ferae naturae*." *Union Gas*, 245 Kan. at 88.

Based on this rationale, the *Union Gas* court determined Union was entitled to a setoff in the condemnation action for the value of its injected gas produced after the certification date. 245 Kan. at 88-89. The court held its value was the selling price less Union's share of production costs based on the ratio of injected gas versus native gas taken, including a reasonable rental for the storage rights during this period—the latter rental concept being consistent with treating Union's migrating gas as trespassing. 245 Kan. at 89. Further supporting its rationale, the court noted, was the Storage Act's provisions specifying landowners were entitled to condemnation awards valuing only the native gas in place, rather than including the value of unproduced injected gas that had migrated to the condemned property. 245 Kan. at 89; see K.S.A. 55-1201(c); K.S.A. 55-1204(a)(2); K.S.A. 55-1205.

Justice Johnson's dissent argues *Union Gas* is distinguishable because in that case the surface area above the migrated storage gas adjoined the field while the storage gas at issue in the present case is two to six miles away. Slip op. at 34-35. But there is nothing in the *Union Gas* court's application of the common-law rule-of-capture principles that turns on geographic proximity to the field. The *Union Gas* court did not use geographical qualifiers when it proclaimed "[a] natural gas utility is exempted from the rule of capture enunciated in [*Anderson*] only after receiving a certificate from the [KCC]." 245 Kan. 80, Syl. ¶ 1. And his dissent points to no portion of the *Union Gas* analysis that would be different *only because* of the distance the storage gas travelled in the subsurface geological formations before being extracted. To be sure, no other legal authority or secondary source that has discussed *Union Gas* makes the geographic distinction Justice Johnson views as analytically critical. See *L.D. Drilling*, 862 F.3d at 1229-30 (summarizing *Union Gas* as holding utility that injected gas without certificate could not

17

recover for gas "produced by others" before certificate date); *Reese Exploration v. Williams Natural Gas*, 983 F.2d 1514, 1523 n.9 (10th Cir. 1993) ("The Kansas Supreme Court held that a public utility is exempt from the rule of capture only after it receive[s] certification . . . ."); Pierce, *2015 Survey on Oil & Gas, Kansas*, 2 Tex. A&M L. Rev. 81, 83 (2015) (describing *Union Gas* as "balancing . . . the storage operator's rights with those of the surrounding landowners"); 4 Summers, Oil and Gas, § 53.13, n.5 (3d ed. 2017) ("In [*Union Gas*], the court held that the landowner's right to the protection of the rule of capture ceased on the date that the gas company obtained the corporation commission approval required by state law to condemn storage.").

Similarly, Justice Stegall's dissent misunderstands *Union Gas* in the process of denouncing it. He claims *Union Gas* is "unequivocally wrong" even though none of the appellate or academic authorities listed above have ever criticized it as such. Slip op. at 48. And Justice Stegall further asserts *Union Gas* authorized the non-consensual storage of injected gas on the property of another. Slip op. at 48. But *Union Gas* simply applied the rule of capture for extracted non-native gas under two factual scenarios—before certification and after. Its holding for the after-certification timeframe determined an offset was appropriate for the injector in calculating a condemnation award. That offset credited the value of the injected gas produced by landowners after the certification date, which the court determined was the selling price less Union's share of production costs based on the ratio of injected gas versus native gas taken. And the court expressly held landowners were entitled to a reasonable rental for the storage that occurred between the certification date and the condemnation. *Union Gas*, 245 Kan. at 88-89.

Far from any "windfall" storage benefit realized by the injector, *Union Gas* required that once the subsurface storage is deemed necessary and in the public interest through the certification process, landowners must be compensated for storage in the course of the condemnation proceedings. What *Union Gas* did not do was give

18

landowners the fruits of their "purloined production" after landowners refused to lease the injector storage rights and the certificate issued. *Union Gas*, 245 Kan. at 88.

In 1993, the Legislature added K.S.A. 55-1210 to the Storage Act. L. 1993, ch. 102, § 1. This addition introduced for natural gas public utilities engaged in underground storage operations new statutory protections against the rule of capture—but only for specified circumstances. *ONEOK I*, 296 Kan. at 920. Relevant to this litigation, the statute provides:

"(a) All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, whether such storage rights were acquired by eminent domain or otherwise, shall at all times be the property of the injector, such injector's heirs, successors or assigns, whether owned by the injector or stored under contract.

"(b) In no event shall such gas be subject to the right of the owner of the surface of such lands or of any mineral interest therein, under which such gas storage fields, sands, reservoirs and facilities lie, or of any person, other than the injector, such injector's heirs, successors and assigns, to produce, take, reduce to possession, either by means of the law of capture or otherwise, waste, or otherwise interfere with or exercise any control over such gas. . . .

"(c) *With regard to natural gas that has migrated to adjoining property* or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:

(1) The injector, such injector's heirs, successors and assigns shall not lose title to or possession of such gas if such injector, such injector's heirs, successors or assigns can prove by a preponderance of the evidence that such gas was originally injected into the underground storage.

. . . .

19

(3) The owner of the stratum and the owner of the surface shall be entitled to such compensation, including compensation for use of or damage to the surface or substratum, as is provided by law, and shall be entitled to recovery of all costs and expenses, including reasonable attorney fees, if litigation is necessary to enforce any rights under this subsection (c) and the injector does not prevail.

"(d) The injector, such injector's heirs, successors and assigns shall have the right to compel compliance with this section by injunction or other appropriate relief by application to a court of competent jurisdiction." (Emphasis added.) K.S.A. 55-1210.

Subsection (c) responded in part to *Union Gas* and *Anderson*, "both of which involved disputes between landowners on *adjoining properties* and both of which resulted in the injector losing title to the storage gas." *ONEOK I*, 296 Kan. at 932-33. In that regard, subsection (c) "preserves the rule of capture as to injected gas which migrates horizontally *beyond property adjoining the certificated boundaries of a storage field*." (Emphasis added.) 296 Kan. at 936.

But *ONEOK I* expressly did not resolve ownership of migrated storage gas produced after the certification date from within the storage field's newly certificated boundaries. 296 Kan. at 942. That question was left for the current proceedings.

With this additional background, we must now decide whether the rule of capture applies to Northern's migrated gas taken after the June 2, 2010 certificate from wells located within its newly certificated boundaries.

Notably, if *Union Gas* remains good law, it dictates the outcome. *Union Gas* held the injector retained title to identifiable migrated storage gas after the KCC certificate date—even though the injector had not yet acquired storage rights to the neighboring property as of that date. *Union Gas*, 245 Kan. at 88-89. And the dispositive KCC

certificate in *Union Gas* was simply the statutory prerequisite to beginning formal condemnation proceedings, just like Northern's FERC certificate. See 15 U.S.C. § 717f(h) (2012). Factually, our present case squares with *Union Gas*, despite Justice Johnson's insistence that geographic proximity controlled the outcome.

Northern contends *Union Gas* applies because K.S.A. 55-1210 does not directly speak to our present circumstance, so it advances stare decisis to argue that the portion of *Union Gas* dealing with newly certificated boundaries controls the outcome. If so, this would cut off the rule of capture for the identifiable, non-native storage gas on the FERC certification date, June 2, 2010, for those wells affected by the certificated boundaries. See *Union Gas*, 245 Kan. at 88.

The district court disagreed, concluding the landowners and their producers retained the right to capture Northern's migrated storage gas until Northern acquired storage rights through its federal condemnation action, i.e., the date of taking, March 30, 2012. The district court based its decision on three premises: (1) the *Union Gas* ruling was superseded in 1993 by K.S.A. 55-1210; (2) *Northern Natural Gas Co.*, 289 Kan. 777, overruled *Union Gas*; and (3) *Union Gas* constitutes an unconstitutional taking of property. We reject the district court's reasoning.

(1) *K.S.A. 55-1210 did not supersede* Union Gas *in this circumstance.*

The district court relied on *ONEOK I* for its belief that K.S.A. 55-1210 superseded *Union Gas*, noting the *ONEOK I* court described K.S.A. 55-1210(c) as enacted in response to *Union Gas* and *Anderson*. But *ONEOK I* did not overrule *Union Gas* nor was it even critical of *Union Gas*. And the portion of *ONEOK I* cited by the district court as supporting its view does not refer to any holding of that case. It simply sets out preparatory "historical context" for the discussion to follow. See *ONEOK I*, 296 Kan. at

21

919 ("Although the entity that stored the gas in *Anderson* . . . was not a natural gas public utility, this court extended *Anderson*'s holding to public utilities in [*Union Gas*].").

The question in *ONEOK I* was the breadth of K.S.A. 55-1210(c)'s new protections for gas that migrated *beyond* a field's certified boundaries, i.e., whether there were circumstances in which our *Anderson* and *Union Gas* rules still applied, or whether the statutory protections had unlimited geographical reach. See *ONEOK I*, 296 Kan. at 930 ("Northern concedes that applying its interpretation, gas which migrates beyond the certificated boundaries of a storage field—whether the gas migrates 1 mile or 1 million miles—remains the property of the injector.").

*ONEOK I* held, in part, that K.S.A. 55-1210(c) "preserves the rule of capture as to injected gas which migrates horizontally *beyond property adjoining the certificated boundaries of a storage field*." (Emphasis added.) 296 Kan. at 936. Indeed, if the pre-certificate storage gas at issue in *Anderson* and *Union Gas* was taken from adjoining property where the injectors lacked storage rights, the portions of those decisions *divesting the injector of title* to the gas others produced would appear infirm. See K.S.A. 55-1210(c) (providing circumstance in which injector keeps title to gas that migrates to adjoining property where it has not acquired storage rights).

But once the *ONEOK I* court concluded the statute did not entirely replace our earlier rule-of-capture caselaw, it reached an outcome consistent with *Union Gas*—the producers were entitled to keep storage gas taken before the certificate expansion. See *ONEOK I*, 296 Kan. at 936, 942; see also *Union Gas*, 245 Kan. at 86-87 (holding Union not entitled to recover for gas produced *before* certificate issued).

It is important to keep in mind *Union Gas* dealt with both pre- and post-certification scenarios. And our rationale in *ONEOK I*—that storage gas protections in K.S.A. 55-1210 are not comprehensive, so our pre-statute caselaw continued to control in

situations not governed by the statute—does not countermand *Union Gas*'s holding that the rule of capture did not authorize taking storage gas *from within* a certificated boundary. Accordingly, under *Union Gas*, Northern became exempt from the common-law rule of capture enunciated in *Anderson* once it received the FERC certificate authorizing it to condemn additional acreage encompassing the offending wells. See *Union Gas,* 245 Kan. at 88.

The district court erred when it concluded K.S.A. 55-1210 superseded *Union Gas* in some way meaningful to the issue in this appeal.

Similarly, Justice Johnson's dissent declares K.S.A. 55-1210 "legislatively overruled" *Union Gas.* Slip op. at 35. But that notion is dispelled by the statute itself and *ONEOK I*, which described the statute's geographic boundaries and expressly held common-law rule of capture caselaw for non-native migrated gas controls in this case because the property involved is not "adjoining" as required by K.S.A. 55-1210(c). *ONEOK I*, 296 Kan. at 936. Likewise, it is wrong to suggest K.S.A. 55-1210(a) and (b) apply because those subsections operate only when storage rights have been acquired. That is not the case here, just as it was not the case in *Union Gas*. Another curious thing about this suggestion concerning subsections (a) and (b) is that if they were applicable, Northern would prevail under those provisions.

The legal question here, as it was in *Union Gas*, is how the common-law rule of capture operates during the time *between* certificate issuance and storage rights acquisition. And that is precisely the question *Union Gas* answered. See *Union Gas*, 245 Kan. at 88 ("[T]he question remains as to [Union's] rights *to its own gas* from January 13, 1986, to April 9, 1987." [Emphasis added.]). And its answer to that question is unaffected by K.S.A. 55-1210 as explained above.

(2) Martin, Pringle *does not overrule* Union Gas.

In ruling against Northern, the district court made much of the following statement from *Martin, Pringle*:

> "[P]rior to July 1, 1993, the landowners adjoining Northern's underground gas storage area possessed the legal right to produce and keep the injected gas which had migrated onto their property, unless and until Northern obtained a certificate to expand its storage area onto their land *and paid them for that privilege through a condemnation action.* K.S.A. 55-1210 abolished that right, as well as permitting migrating gas to trespass upon adjoining land." (Emphasis added.) *Martin, Pringle*, 289 Kan. at 791.

Based on the italicized language, the district court concluded the right to produce the migrated storage gas could not be taken from landowners and their producers unless Northern obtained a certificate to expand its storage area onto their land *and* paid them through the federal condemnation action. Put more simply, in the district court's view, the producers could keep taking Northern's gas after the certificate date until the federal condemnation proceedings settled on a date of taking. The dissenters take a similar view.

But this interpretation of *Martin, Pringle* would circumvent the *Union Gas* court's express declaration that an injector retained title to migrated storage gas after the certificate date, even after it had been reduced to possession by someone else. *Union Gas*, 245 Kan. at 88. This raises a question as to whether the *Martin, Pringle* court intended to disturb the *Union Gas* decision on this point. We hold it did not.

To begin with, *Martin, Pringle* simply presented a certified question from a Nebraska federal court. *Martin, Pringle*, 289 Kan. 777. And the state district court's interpretation that *Martin, Pringle* somehow overruled *Union Gas* would extend *Martin, Pringle* beyond the federal court's question and the Kansas court's answer, which were:

24

"Does an injector of natural gas into underground storage, who demonstrates such gas was originally injected into underground storage but migrated to adjoining property or to a stratum or portion thereof which has not been condemned as allowed by law or otherwise purchased, lose title to or possession of the migrated gas when the gas migrated before July 1, 1993, the effective date of the controlling statute, K.S.A. 55-1210, and was not captured or reduced to possession by another prior to July 1, 1993? As presented in this case, the answer to the certified question is 'yes.'" 289 Kan. 777, Syl.

The submitted question asked only about Northern's title to storage gas that migrated to adjoining property before July 1, 1993. And the court's holding tracks the common-law contours as traditionally followed. See *Anderson*, 237 Kan. at 347-48 (injector "lost its ownership of the stored gas after injecting it into the reservoir in this case"); see also 1 Kuntz, Law of Oil & Gas, § 2.4 (1987) (Ownership-in-place theory "is qualified . . . in the case of oil and gas, by the operation of the law of capture. If the oil and gas depart from beneath the owned land, ownership in such substance is lost.").

More importantly, the *Martin, Pringle* court did not explicitly state it was overruling *Union Gas*, nor did it employ any analysis critical of *Union Gas*. And, unlike *Union Gas*, *Martin, Pringle* did not involve questions about title to migrated storage gas or the rule of capture in an area within a certificated storage area. Indeed, the *Martin, Pringle* court relied on that very distinction when it held

"*Union Gas* clarified that such a utility has the statutory ability *to obtain a certificate* for an underground storage area and that the failure to use that remedy places the utility squarely under the rule of *Anderson*. [Citation omitted.] Given that Northern *did not obtain a certificate* to condemn the adjacent landowners' property prior to July 1, 1993, the adjoining landowners possessed a right, title, and interest in and to the gas which had migrated to the adjoining property as of that date." (Emphases added.) 289 Kan. at 790-91.

25

This statement follows the portion of *Union Gas* addressing the rule of capture before certification. That is to say, once the storage gas migrated offsite, it was subject to capture by adjoining landowners, who could produce it and obtain title for themselves if they did. *Union Gas*, 245 Kan. at 86-87. And the *Martin, Pringle* court did not even suggest *Union Gas* was wrongly decided as to either of its holdings, i.e., title remained with the injector of storage gas after certification, or that the rule of capture was extinguished within the newly designated boundaries upon certification. *Union Gas*, 245 Kan. at 88.

In any event, the phrase "and paid them for that privilege through a condemnation action" in *Martin, Pringle* is dicta and devoid of any caselaw support or analytical explanation. The question posed by the Nebraska federal court dealt with the injector's title under the specific circumstances presented. That question was answered within the common law recited in *Anderson* as noted above. Any notion *Union Gas* was overruled would necessarily include at least some critical analysis of its rationale, which *Martin, Pringle* does not provide. The district court and the dissents read more into *Martin, Pringle* than was there.

Similarly, the contention that *Martin, Pringle* overruled *Union Gas* is unsupported by *ONEOK I*. As discussed above, the *ONEOK I* court specifically clarified K.S.A. 55-1210 superseded the rule of capture described in *Union Gas* and *Anderson* only for property adjoining the injectors' certificated storage areas. *ONEOK I*, 296 Kan. at 932-33 (reasoning that the phrase "adjoining property" carried geographic limitations because K.S.A. 55-1210 was enacted in "response to" the "narrow circumstances" of *Union Gas* and *Anderson*, which "involved disputes between landowners on adjoining properties and . . . resulted in the injector losing title"). The *ONEOK I* court expressly held the statute did not address all ownership questions for injected natural gas in all situations. And we further note that when the *ONEOK I* court addressed Northern's taking argument based on *Union Gas*, the court dispatched it on the merits instead of simply saying *Martin,*

26

*Pringle* overruled *Union Gas. ONEOK I*, 296 Kan. at 938-40. The *ONEOK I* court would not have analyzed this point as it did if *Union Gas* was no longer good law.

Moreover, to the extent the dissenters believe *Martin, Pringle* demonstrates the mineral interest owners in this case acquired a real-property interest, described as "the landowner's right to capture," that could not be divested other than through a condemnation proceeding, they are mistaken. Regardless of whether the right to produce is an interest that runs with the land, that right's cessation is not a taking of property. And despite the problems Justice Johnson perceives in the caselaw that applies the label of "title," it is clear that until the moment migrated storage gas is extracted and sold, the injector retains some interest in it. See *Union Gas*, 245 Kan. at 87 ("The element of exclusiveness is not met because Union *shared occupancy of the subsurface* with the DeTars' native gas." [Emphasis added.]); slip op. at 42 (referring to landowners' "right to capture" Northern's gas "that trespassed onto" their property).

Contrary to the dissenters' view, government action did not "take" property from the landowners. The storage certificate, in combination with our rule-of-capture caselaw, terminated the right to produce and keep Northern's migrated gas. That is because the landowners could not have any reasonable expectation that the right would continue past that point. See *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984) (noting whether a taking occurred is an ad hoc factual inquiry; factors include character of government action, economic impact, and whether it interferes with reasonable investment-backed expectations). In other words, the accurate description of the landowners' interest under Kansas law was an interest in producing and keeping the storage gas *until the certificate date*. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); see *Monsanto*, 467 U.S. at 1001 (citing *Roth*

27

definition of property interest in a takings case). This was the Tenth Circuit's point when it reversed the federal district court's condemnation award. *L.D. Drilling*, 862 F.3d at 1227-28 ("We disagree with the inclusion of the value of storage gas in and under the Extension Area on the date of taking because we find that the Landowners and Producers *had no right to produce such gas after the date of certification*." [Emphasis added.]).

*Anderson* created a right to take migrated gas prior to the certification date, and *Union Gas* placed landowners on notice that this right terminated once the injector obtained certificated storage authority. See *Monsanto*, 467 U.S. at 1006-07 (government disclosure of health, safety, and efficacy data submitted by private company was not a taking because statute prescribed time limit on confidentiality period); cf. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 136, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978) (noting landmark preservation law did "not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel," i.e., a railroad terminal, and that owner "may continue to use the property precisely as it has been used for the past 65 years").

(3) Union Gas *does not constitute an unconstitutional taking of property.*

The state district court supplied one other rationale for concluding the *Union Gas* rule could not allow Northern an ownership interest in its own storage gas produced by others after the certificate date. It viewed such an outcome as an unconstitutional taking of property without just compensation based on the federal district court's decision in *Northern Natural Gas Co. v. Appx. 9,117 Acres in Pratt*, No. 10-1232-MLB-DWB, 2015 WL 471244 (D. Kan. 2015). And the state district court reached its conclusion even though the Tenth Circuit reversed the portion of the federal district court's rationale the state court relied on. *L.D. Drilling*, 862 F.3d at 1232 ("[T]he commission erred by including the value of that [storage] gas in the condemnation award when the Landowners and Producers had no vested property rights or ownership interests in the gas

28

on the date of taking."). The state district court did not even mention the Tenth Circuit's contrary analysis.

The federal circuit court explained its ruling in this way:

"[K]ansas case law and the statutory scheme set forth in § 55-1210 emphasize the importance of timing and certification. Applying those principles here, the date of taking was March 30, 2012, the date on which Northern perfected its right to take physical possession of the property by posting security and providing notice to relevant landowners. [Citation omitted]. On this date, Northern held certificates expanding its field boundaries to include all of the Extension Area land. Indeed, it obtained private storage leases covering over 3,000 acres of the 2010 Extension Area in February 2009 (more than three years before the date of taking) and obtained certificate authority over the entire 2010 Extension Area on June 2, 2010 (nearly two years before the date of taking).

"Thus, while the Landowners and Producers may have held certain property rights over the natural gas in and under their land at some point in time *before* Northern obtained the authority (via private lease agreements and proper regulatory certification) to include the property within the Cunningham Field's legal boundaries, these rights had been eliminated by the date of taking. On the date of taking, the gas 'in place' in and under the Extension Area land was within the Cunningham Field's certified boundaries as required by Kansas law and, accordingly, was wholly Northern's property. Because of Northern's ownership, the gas was not subject to the rule of capture." 862 F.3d at 1231-32.

The state district court's view hinges on its belief that storage gas migrating outside Northern's original certificated area became part of the real estate and the property of someone other than Northern. But, as discussed previously, this ignores that the right landowners and producers had up to the certification date was based entirely on the common-law rule of capture. See *ONEOK I*, 296 Kan. at 919. And as the Tenth Circuit explained in rejecting the Fifth Amendment unconstitutional taking claim:

29

"[T]his argument relies on a fundamental misconception about the rule of capture, which the Landowners and Producers suggest gives them vested property interests in all gas that has migrated, or will ever migrate, to their property. *The rule of capture, however, confers only a right to produce the migrated gas. It confers no right to the gas itself.*" (Emphasis added.) *L.D. Drilling*, 862 F.3d at 1232.

The Tenth Circuit correctly described the operation of Kansas common law. The rule of capture does not vest title, it simply recognizes an ability to produce. *Mobil Exploration*, 258 Kan. at 800; *Carlock*, 151 Kan. at 411; *Prewett*, 118 Kan. at 576. But once Northern obtained its new certification, that common-law right to produce this gas was no longer operative. See *Union Gas*, 245 Kan. at 88 ("The title to Union's captured gas remained in Union.").

Admittedly, the federal courts were addressing a different legal question, i.e., whether to value unproduced migrated gas for condemnation purposes as opposed to the ability to keep migrated gas produced after certification of Northern's expanded boundaries. Even so, the Tenth Circuit correctly viewed our state's common law in its lead up to answering the federal issue. The state district court erred when it relied on the federal district court's rationale that was overruled by the federal circuit.

Union Gas *controls*

As previously discussed, *Union Gas* limited how the rule of capture applied to storage gas injected by a natural gas public utility after the certification date for new acreage. Its lessons are applicable to this appeal, and we hold *Union Gas* should control. The defendants, third-party defendants, and amici landowners and producers ask us to overrule *Union Gas*. We decline that invitation.

The doctrine of stare decisis maintains that once a point of law is established by a court, it will generally be followed by the same court and all courts of lower rank in later cases when the same legal issue is raised. A court of last resort will follow that doctrine unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent. *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 (2010). Stare decisis "'promote[s] system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court.'" *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 356, 789 P.2d 541 [1990], *overruled on other grounds Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 [1991]).

Stare decisis considerations are strong "'in cases involving property and contract rights, where reliance interests are involved.'" *Crist*, 277 Kan. at 715 (refusing to overturn a rule of general liability insurance contract interpretation established 30 years earlier). Our caselaw addressing the common-law rule of capture and its inapplicability to non-native storage gas within the boundaries of a certificated underground gas storage facility involves specialized property and contract rights, so our stare decisis concerns are weighty.

Professor David E. Pierce conceptualizes the outcomes in our court's storage gas cases in a way that supports the *Union Gas* view as a part of the rule-of-capture caselaw the *ONEOK I* court held was preserved. He characterizes *Anderson* as "what [the court] thought was an elegant solution to the presence of storage gas that migrated into lands not subject to a gas storage agreement." Pierce, *2015 Survey on Oil & Gas, Kansas*, 2 Tex. A&M L. Rev. 81, 82 (2015). And in his view, the "*Union Gas* approach maintained the elegance of the Court's *Anderson* solution without over-compensating the landowner." 2 Tex. A&M L. Rev. at 83. He views *Union Gas* as establishing that

31

"once the party injecting the gas sought to condemn the right to use the surrounding parts of the reservoir, the self-help capture option would end. In return, the landowner would receive payment for the right to use its underlying reservoir for gas storage, in addition to any gas it was able to produce and sell prior to condemnation." 2 Tex. A&M L. Rev. at 82-83.

Professor Pierce notes the court "in *Anderson*, *Union Gas*, and *ONEOK* [*I*] was careful to describe the right at issue as the right to capture the gas." 2 Tex. A&M L. Rev. at 86. And he argues:

"The Kansas Supreme Court's recognition of a limited right to capture does not require that the court recognize any greater property interest. The *Anderson*/*Union Gas* analysis limited capture rights were designed to strike a remedial balance between the parties to gas storage disputes. It was not intended, nor required, that the Court rationalize the remedy in the context of the Kansas ownership-in-place theory for fee ownership of minerals." 2 Tex. A&M L. Rev. at 86.

*Union Gas* is part of the body of our state's capture-law in the unique context of migrated storage gas. It held the gap-filling rule permitting others to capture and keep an injector's gas, as developed in our caselaw, does not apply after a natural gas public utility obtains certificated authority to use a storage area and its gas within that area is identifiable. Its principles have been relied on in later caselaw as discussed above, which speaks to its durability.

We hold the *Union Gas* exception to the common-law capture rule should continue. The district court erred when it entered judgment against Northern.

Reversed and remanded.

32

BEIER, J., not participating.

MIKE KEELEY, District Judge, assigned.[1]

* * *

JOHNSON, J., dissenting:  I disagree with the notion that a federal executive branch agency can administratively take a property interest from a Kansas landowner and give it to a for-profit corporation, even one designated as a public utility. An appropriate order issued by a Kansas judge in a condemnation action conducted in accordance with Kansas statutes is required to effect that transfer. Moreover, in my view, the majority adulterates the doctrine of stare decisis, ignores the doctrine of law of the case, and misinterprets the controlling statutory scheme. Therefore, I dissent.

As a prelude, I would emphasize that these parties were previously before this court on the same dispute involving the same underground storage facility in *Northern Natural Gas Co. v. ONEOK Field Services Co*., 296 Kan. 906, 296 P.3d 1106 (2013) (designated as *ONEOK I* by the majority). In that appeal, we decided the issues that had been considered by the district court but remanded for the lower court to consider the issues that arose subsequently. The case returns to us on those subsequent issues but in the context of the legal points declared the first time around. That circumstance has a significance that is apparently unappreciated by the majority. See *State v. Kleypas*, 305 Kan. 224, Syl. ¶ 2, 382 P.3d 373 (2016) ("Under the law of the case doctrine, when a second appeal is brought in the same case, the first decision is the settled law of the case

---

[1]**REPORTER'S NOTE:**  District Judge Keeley was appointed to hear case No. 118,239 vice Justice Beier under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

33

on all questions involved in the first appeal, and reconsideration will not normally be given to such questions.").

Instead of law of the case, the majority relies on its notion of the doctrine of stare decisis. But I submit that stare decisis is being misapplied here. *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 774 P.2d 962 (1989), is not controlling precedent in this appeal for multiple reasons: (1) *Union Gas* did not decide the same legal issue that is presented here; (2) *Union Gas* was superseded by statutory amendment; and (3) *Union Gas* is not this court's latest pronouncement on the point the majority contends it controls.

On the first point, we recently described the doctrine of stare decisis as instructing "'that points of law established by a court are generally followed by the same court and courts of lower rank in later cases *in which the same legal issue is raised*.' [Citation omitted.]" (Emphasis added.) *State v. Spencer Gifts*, 304 Kan. 755, 766, 374 P.3d 680 (2016). Although the factual distinctions between *Union Gas* and the instant case can be gleaned from a close reading of the majority opinion, its analysis conveniently ignores that *Union Gas* presented a different issue than is before us now.

The majority identifies the issue in *Union Gas* as "relating to a natural gas public utility's ownership of migrated non-native gas withdrawn by a *neighboring* landowner" and describes the circumstance involved as "Union had an underground facility, and its storage gas migrated to *adjoining* property." (Emphasis added.) Slip op. at 15. In the *Union Gas* opinion, Union's storage operations were described as being "on adjacent property" to the landowners. 245 Kan. at 83. Indeed, in this same case, we stated unequivocally that both *Union Gas* and *Anderson v. Beech Aircraft Corp.*, 237 Kan. 336, 347-48, 699 P.2d 1023 (1985), involved disputes between natural gas injectors and "landowners on *adjoining properties*." *ONEOK I*, 296 Kan. at 932-33. In contrast, the majority's factual recitation acknowledges that the non-native gas at issue in this case was *not* withdrawn from adjoining property but rather it was produced from land "two to six

34

miles" from the boundary of the underground storage facility. Slip op. at 3-4; see *ONEOK I*, 296 Kan. at 922 (citing to *Williams Natural Gas Co. v. Supra Energy, Inc.*, 261 Kan. 624, 931 P.2d 7 [1997], for the definition of "adjoining property" as used in K.S.A. 55-1210[c] meaning a section of land touching a section of the storage area).

That difference in the point of withdrawal by the landowner is legally significant. We specifically held—*in this case*—that, subsequent to the passage of K.S.A. 55-1210(c), a gas storage utility's interest in migrating injected gas depends upon whether the gas has migrated only to the adjoining property or has migrated *beyond* the adjoining property. *ONEOK I*, 296 Kan. at 928-29 (K.S.A. 55-1210[c] "preserves the rule of capture *except as to gas that has migrated horizontally to adjoining property* or vertically to a stratum or portion thereof not leased or condemned by the injector." [Emphasis added.]). In other words, the legal principles that apply to determine the ownership of injected gas under adjoining property (the circumstance involved in *Union Gas*) are now different than the legal principles that apply to determine the ownership of gas that migrated beyond adjoining land (the circumstance involved in this appeal).

The majority responds that *Union Gas* "did not use geographical qualifiers." Slip op. at 17-18. But the Kansas Legislature did when it enacted K.S.A. 55-1210(c) and this court did when it construed the "adjoining property" language of the statute to mean a section of land touching a section of the storage area. Moreover, *Union Gas* had no reason to talk about runaway gas six miles from the storage field.

Next, besides involving a different legal issue, the relevant holdings in *Union Gas* do not invoke the doctrine of stare decisis because those holdings have been abrogated and superseded by statute. The majority does not explain why a legislatively overruled decision should be considered binding precedent.

35

The relevant holdings in *Union Gas* were that Union was not entitled to recover compensation for any of its gas produced by the adjoining landowner prior to Union obtaining a Kansas Corporation Commission certificate to include the adjoining land in its storage field, i.e., the rule of capture applied prior to the expansion certification. But Union could obtain an offset against the condemnation award for the value of identified non-native gas produced after the certification of the storage field expansion; in other words, after certification, Union "acquired a changed status." *Union Gas*, 245 Kan. at 88.

Neither of those holdings survive the enactment of K.S.A. 55-1210(c), which changed the common law with regard to the rule of capture on property adjoining a storage field. *ONEOK I*, 296 Kan. at 923-24 ("[E]ffective July 1, 1993, K.S.A. 55-1210 abolished the right of capture as to storage gas that migrates to adjoining property."). Under a statutory analysis, Union would have been able to recover *all* of its identifiable injected gas that migrated to the adjoining property, from and after the date it was injected into the ground. The date of the certification of the storage field expansion would matter not a whit; Union's status with regard to the injected gas would *not* have changed upon certification. Again, both of *Union Gas*' holdings—that the rule of capture applies to injected gas that migrates to adjoining property and that the rule of capture on adjoining property terminates upon the certification of storage field expansion to include the adjoining property—were invalidated by the 1993 amendment to K.S.A. 55-1210 and no longer have the force of law, much less the binding effect of stare decisis.

Apparently, the majority fails to recall what all of its members said about the precedential value of *Union Gas* the first time this case was before us on appeal. Then, we referred to the *Union Gas* case as being "*superseded by statute as stated* in [*Northern Natural Gas Co. v.*] *Martin, Pringle*[*, et al.*], 289 Kan. 777[, 217 P.3d 966 (2009)]." *ONEOK I*, 296 Kan. at 920.

36

Nevertheless, the majority attempts to breathe life into *Union Gas* by characterizing one of the case's holdings as being that "the rule of capture did not authorize taking storage gas *from within* a certificated boundary," and asserting that *Union Gas* still governs on that point of law. Slip op. at 23. While that creativity furthers the majority's stare decisis argument in this review, it is directly contradicted by the law of this case. We were very plain in *ONEOK I* that, subsequent to the 1993 amendments to K.S.A. 55-1210, ownership rights within a storage field were *governed by statute*, not any common law from pre-amendment cases. Specifically, we said that "we interpret K.S.A. 55-1210(a) and (b) to govern ownership rights to previously injected storage gas that remains within a *designated* underground storage area." (Emphasis added.) 296 Kan. at 936. The point that the right to take gas from within a storage field's certificated boundary is now governed by statute, rather than prior caselaw, was corroborated in *ONEOK I*'s syllabus, to-wit: "K.S.A. 55-1210(a) and (b) govern ownership rights to previously injected storage gas that remains within a designated underground storage area." 296 Kan. 906, Syl. ¶ 7; see also 296 Kan. 906, Syl. ¶ 6 ("K.S.A. 55-1210[a] gives an injector title to gas injected into its legally recognized storage area. By its plain terms, however, section [a] does not apply to gas that has migrated outside the injector's certificated storage area.").

Finally, the majority acknowledges that the overruled holdings in *Union Gas* were not our last word on the topic, albeit the members of the majority who previously participated in contradicting *Union Gas* must be having second thoughts. In *Martin, Pringle*, 289 Kan. at 791—decided 20 years after *Union Gas* was filed and 16 years after the case was superseded by statute—we said that certification of an expansion of the underground gas storage area was not enough; the gas storage utility had to complete the process through the date of taking in a condemnation action. Four years later, *ONEOK I* (again, the same case that we have before us now) repeated that proposition:

37

"In response to the common law as it had developed in *Union Gas* and *Anderson,* the legislature enacted in 1993 the statute at issue in this case, K.S.A. 55-1210. In *Martin, Pringle*, we succinctly described the state of the law preceding the effective date of the statute:

"'[P]rior to July 1, 1993, the landowners adjoining Northern's underground gas storage area possessed the legal right to produce and keep the injected gas which had migrated onto their property, unless and until Northern obtained a certificate to expand its storage area onto their land *and paid them for that privilege through a condemnation action.* K.S.A. 55-1210 abolished that right, as well as permitting migrating gas to trespass upon adjoining land.' 289 Kan. at 791." (Emphasis added.) *ONEOK I*, 296 Kan. at 920.

The majority faults both *Martin, Pringle* and *ONEOK I* for failing to specifically overrule *Union Gas*. But, as pointed out above, the Legislature had already done that by enacting K.S.A. 55-1210 a quarter-century ago. Moreover, our opinion in *ONEOK I*, at 296 Kan. at 919-20, refers to *Union Gas* as "superseded by statute." That seems plain enough. But if a researcher is unclear about *Union Gas*' status after reading *ONEOK I*, a cursory look at WestlawNext will clarify matters. There, one first encounters a red flag, denoting the case is no longer good law, followed by the explanation: "**Superseded by Statute as Stated in** Northern Natural Gas Co. v. ONEOK Field Services Co., Kan., March 15, 2013." That notification to future litigants certainly undermines the majority's rationale that *Union Gas* must control this case because "'reliance interests are involved.'" Slip op. at 31. Is reliance on a case that has been superseded by statute justifiable?

Pointedly, none of the current majority who participated in *ONEOK I* wrote separately to object to or contradict the plainly stated precedential status of *Union Gas*. Of course, if the majority wants to repurpose *Union Gas*' overruled holding on the change-of-status effect of a storage field expansion certificate to assist in construing how K.S.A. 55-1210 operates under this different factual scenario, it is free to do so. But such a tack should have to stand on its own merits, not on a pseudo-stare decisis declaration.

38

Moreover, the majority should have to explain why it is resurrecting *Union Gas*' continuity-of-title fiction, when it clearly rejected the notion of retained title earlier in this case. See *ONEOK I*, 296 Kan. at 936 ("Before June 2, 2010, Northern *lost title* to such [migrated] gas." [Emphasis added.]).

Further, given that *ONEOK I* declared this case to be a matter of statutory construction, one might have expected a discussion of such matters as the legislative intent in overruling *Union Gas* while making specific provision only for adjoining property, or a discussion of construing K.S.A. 55-1210 in harmony with the statutory provisions governing condemnation actions. Nevertheless, in my view, our more recent pronouncements on when the rule of capture terminates on migrating gas, i.e., on the date of taking in the condemnation action, is the only supportable and logical holding.

To begin, the majority reads *Union Gas* as expressly declaring that "an injector retained title to migrated storage gas after the certificate date, even though it had been reduced to possession by someone else." Slip op. at 24. But what *Union Gas* baldly asserted was simply: "The title to Union's captured gas remained in Union." 245 Kan. at 88. Neither the declaration by the *Union Gas* court nor the creative interpretation of that declaration by the majority can withstand closer scrutiny.

Initially, I'm unclear as to what the majority means by the phrase, "retained title to migrated storage gas." Slip op. at 24. With respect to the word "title," Black's Law Dictionary 1712 (10th ed. 2014) defines that term as referring to either the quality of ownership interest a person has in the subject property or the evidence of that person's ownership interest, e.g., a deed. Given that there is nothing in the record to suggest that any documentary evidence of ownership exists for fungible migrating gas, the majority must be using "title" to mean the injector's legal interest in the migrating gas. That qualitative part of Black's definition reads as follows: "**title.** (15c) **1.** The union of all

39

elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person who owns property and the property itself <no one has title to that land>. Cf. ownership; possession." Black's Law Dictionary 1712 (10th ed. 2014). Over a century ago, our predecessors on this court, in construing an insurance policy, opined that "[t]he word 'interest' as used in the policy is not synonymous with title," because "'title' as there used was intended to mean the *entire estate*." (Emphasis added.) *Garner v. Insurance Co.*, 73 Kan. 127, 130, 84 P. 717 (1906). In other words, one with the "title" to property owns the entire estate and is invested with all of the elements or incidents of ownership.

In that vein, this court has previously instructed that "incidents of ownership in property generally include the right to its possession, use and the enjoyment of its products, in addition to legal title and the right to sell or otherwise dispose of it. (73 C.J.S., Property, § 13, p. 192; 63 Am. Jur. 2d, Property, § 36, p. 321.)" *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, 515-16, 561 P.2d 779 (1977). To be abundantly clear, "[a] right of sale is an incident to the ownership of property." *Wood v. Hatcher*, 199 Kan. 238, 243, 428 P.2d 799 (1967). More recently, we explained the concept of ownership incidents as follows:

"As noted in Black's Law Dictionary, '[i]t is common to describe property as a "bundle of rights." These rights include the right to possess and use, the right to exclude, and the right to transfer.' Black's Law Dictionary 1410 (10th ed. 2014); see also Black's Law Dictionary 1517 (10th ed. 2014) ('right' is 'power, privilege, or immunity secured to a person by law'); Black's Law Dictionary 1358 (10th ed. 2014) ('power': 'The legal right or authorization to act or not act; a person's or organization's ability to alter, by an act of will, the rights, duties, liabilities, or other legal relations either of that person or of another.')." *In re Tax Appeal of BHCMC*, 307 Kan. 154, 166, 408 P.3d 103 (2017).

Under the law of this case, the landowners had the right to capture and produce, possess and use, sell and transfer, and keep and enjoy the profits gained from the injected

gas that migrated horizontally to their property, prior to the time the injector obtained storage rights in the landowners' property or in adjoining properties. See *ONEOK I*, 296 Kan. at 933 ("[S]ection [c] preserved the rule of capture as to injected gas which migrates horizontally within a stratum and beyond adjoining property . . . in which the injector has not obtained storage rights."). If, prior to June 2, 2010, all of the elements constituting the legal right to control and dispose of the migrated gas were united in the landowners, i.e., the landowners held all essential rights with respect to the gas, how could Northern (the injector) *retain* title (the entire estate) to that same gas? The short answer is that it could not; the entire estate in the migrating gas cannot be concurrently held by both the injector and the landowner. The injector might well "regain" or "reacquire" title to the migrated gas through some process, but the injector could not "retain" title while the landowner possessed all of the important rights in the bundle.

Again, most importantly, we clearly rejected the continuity-of-title fiction from *Union Gas* in the earlier appeal of this case when we explicitly declared that Northern had "lost title" to the gas that migrated prior to expanding its storage field. *ONEOK I*, 296 Kan. at 936. Losing title to the gas is the antithesis of retaining title.

The majority avoids this conundrum by pointing to the Tenth Circuit's declaration that "[t]he rule of capture, however, confers only a right to *produce* the migrated gas. It confers no right to the gas itself." *Northern Natural Gas Co. v. L.D. Drilling*, 862 F.3d 1221, 1232 (10th Cir. 2017), *cert. denied* 138 S. Ct. 747 (2018). Of course, it is this court's responsibility and authority to construe Kansas statutes; no deference need be given to a federal court's interpretation of our State's laws. Only this court can definitively and finally declare such a counterintuitive rule of property law that gives a landowner the right to personally profit from the sale of gas without having any right to the gas itself.

41

But more to the point here, the precise issue to be decided by the Tenth Circuit was "whether Northern owned the relevant [migrated] storage gas on March 30, 2012," the date of taking in the condemnation action. 862 F.3d at 1228. I agree with the Tenth Circuit's result—upon condemnation, the injector does not have to pay the landowner for the migrated gas. But I take exception to its unnecessary holding that the rule of capture terminates upon certification. That declaration was unnecessary because the same result obtains as a matter of statutory interpretation. K.S.A. 55-1205 directs the appraiser in the condemnation action to "take into consideration the amounts of recoverable oil and *native gas* remaining in the property sought to be appropriated." (Emphasis added.) Under the statutory construction maxim, *expressio unius est exclusio alterius*, the inclusion of native gas implies the exclusion of migrated non-native gas. Given that we normally expect that the Legislature acts with full knowledge of existing law, *State v. Henning*, 289 Kan. 136, 144-45, 209 P.3d 711 (2009), K.S.A. 55-1205 must mean that on the date of taking in the condemnation proceeding, the landowner loses the right to capture.

Perhaps recognizing the absence of logic in the Tenth Circuit's pronouncement of Kansas law, the majority pivots to a law professor's law review article in a Texas publication. Slip op. at 31-32. In the article, the professor opines that the Kansas Supreme Court recognized a "limited right to capture" in order to fashion a compromise remedy in gas storage disputes that did not need to comport with property ownership principles. Pierce, *2015 Survey on Oil & Gas, Kansas*, 2 Tex. A&M L. Rev. 81, 86 (2015). If that were true, it would mean that this court is setting public policy in gas storage disputes by divining a hybrid rule of capture. But the "'declaration of public policy is normally the function of the legislative branch of government.'" *Bland v. Scott*, 279 Kan. 962, 966, 112 P.3d 941 (2005) (quoting *Ling v. Jan's Liquors*, 237 Kan. 629, Syl. ¶ 5, 703 P.2d 731 [1985]). Indeed, the Legislature has injected itself into the gas storage dispute arena through its amendments to K.S.A. 55-1210, and "[c]ourts should avoid making public policy where the statutory law has developed." *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575, 56 P.3d 789 (2002). But, even so, the majority curiously quotes from a

42

portion of the article where the professor says that *Union Gas* established that "'the landowner would receive . . . any gas it was able to produce and sell *prior to condemnation*.'" (Emphasis added.) Slip op. at 32; 2 Tex. A&M L. Rev. at 82-83. With that, I agree. The landowner's right to produce and sell the migrated gas terminates on the date of taking in the condemnation proceeding, not upon agency certification.

Perhaps my disconnect with the majority is most firmly rooted in its singular focus on the "title" to the injected gas without perceiving that the rule of capture involves an interest in real estate, regardless of who is assigned the title to the gas. The majority does not dispute that we have already decided in this case that the landowners involved here possessed the right to capture the injected gas that trespassed onto their property. The landowner could produce, possess, use, sell, and profit from the trespassing gas. Moreover, that right of capture was inextricably tied to the ownership of the real estate; no one else had the right to put down a vertical well and produce the gas from the landowner's real estate without the landowner's consent. Prior to June 2, 2010, if a landowner had sold the real estate subject to the rule of capture by warranty deed, without exceptions or reservations, the buyer would then have possessed the right to produce, possess, and profit from the sale of the injected gas, i.e., the right to capture would pass to the buyer as part of the purchased real estate. In other words, the right to capture is an incident of real estate ownership that runs with the land. That right exists regardless of whether the landowner exercises the right. Consequently, when the majority terminates the landowner's right to capture, it takes an interest in real estate from the landowner and gives it to the injector.

The majority's conclusory assertion that government action did not take a property interest from the landowners puts me in mind of my predecessor's response to a similarly illogical assertion: "Obviously, the majority subscribes to the view that if it looks like a duck, walks like a duck, and quacks like a duck, it's a chicken." *State v. Lessley*, 271 Kan. 780, 800, 26 P.3d 620 (2001) (Allegrucci, J., concurring and dissenting).

43

Having said all that, I arrive at the core question in this case, in my view: Who should be empowered to take an interest in real estate from the landowner—that is, the right to capture the gas underlying the real estate—and give it to a natural gas utility? Should the power to extinguish a Kansas landowner's right of capture be invested in a state or federal executive branch regulatory agency? Or should that power be reserved to the same court of law that has the sole authority to condemn the landowner's other rights in the land, such as the right to possess the substratum and the right to capture native gas? Viewing the statutory scheme as a whole points us to the court of law.

As the majority points out, prior to the enactment of the Underground Storage of Natural Gas Act, K.S.A. 55-1201 et seq., a privately owned, for-profit corporation in the business of transporting or distributing natural gas via pipelines in this state could not take another's subsurface property without the owner's consent. The Storage Act changed that by granting any person, firm, or corporation meeting the definition of a natural gas public utility the right to appropriate land to use for the underground storage of natural gas under certain circumstances. In other words, the Legislature chose to occupy this area of the law. Yet, the majority does not appear to consider the actual provisions of the Storage Act.

In order to reach its result, the majority has to equate the agency certification of an expansion to an underground natural gas storage area with the authority to *actually use* the added expansion land for storage. In discussing *Union Gas*' holding that the injector retained title to the migrated gas after the certification date, as if title to that gas was never lost, the majority states: "The key features for this continuity of title were (1) *an authorized storage operation*, and (2) the ability to identify the storage gas. 245 Kan. at 88." (Emphasis added.) Slip op. at 16. It reiterates this concept in concluding that *Union Gas* "held the gap-filling rule permitting others to capture and keep an injector's gas, as developed in our caselaw, does not apply after a natural gas public utility obtains *certificated authority to use a storage area* and its gas within that area is identifiable."

44

Slip op. at 32. But the Storage Act provisions do not now, nor did they ever, support such an elevated status for agency certification.

As is often the case, the Storage Act begins with definitions. K.S.A. 55-1201. Then, K.S.A. 55-1202 declares the public interest and welfare in storing natural gas underground. Here, we first encounter the role that the Kansas Corporation Commission (Commission) is to perform in the process, to-wit: "Therefore in the manner hereinafter provided the commission may find and determine that the underground storage of natural gas as hereinbefore defined is in the public interest." K.S.A. 55-1202. In other words, the Commission's certification process assures that a particular storage field "promotes the public interest and welfare of this state." K.S.A. 55-1202.

Next, K.S.A. 55-1203 provides for the appropriation of certain property for the underground storage of natural gas and reiterates the Commission's role in the process, i.e., "the commission shall have found [the subsurface stratum or formation] to be suitable and in the public interest for the underground storage of natural gas." K.S.A. 55-1204 is more explicit; it labels Commission certification as merely a "condition precedent" to the exercise of eminent domain, indicating that it is condemnation that gives rise to the utility's ability to use property for underground storage of natural gas. Specifically, K.S.A. 55-1204(a) states:

> "Any natural gas public utility desiring to exercise the right of eminent domain as to any property for use for underground storage of natural gas shall, as a condition precedent to the filing of its petition in the district court, obtain from the commission a certificate setting out findings of the commission:
>
> (1) That the underground stratum or formation sought to be acquired is suitable for the underground storage of natural gas and that its use for such purposes is in the public interest; and

45

(2) the amount of recoverable oil and native gas, if any, remaining therein."

In the event the foregoing was not clear enough that Commission certification, standing alone, does not create "an authorized storage operation" and does not authorize the natural gas utility to *use* the proposed new storage area, the Legislature provided us with K.S.A. 55-1205, labeled, "Eminent domain procedure." That provision explains as follows:

"Any natural gas public utility, having first obtained a certificate from the commission as hereinbefore provided, desiring to exercise the right of eminent domain for the purpose of acquiring property for the underground storage of natural gas shall do so in the manner provided in K.S.A. 26-501 to 26-516, inclusive. The petitioner shall file the certificate of the commission as a part of its petition and no order by the court granting said petition shall be entered without such certificate being filed therewith. The appraisers in awarding damages hereunder shall also take into consideration the amounts of recoverable oil and native gas remaining in the property sought to be appropriated and for such purposes shall receive as prima facie evidence of such amounts the findings of the commission with reference thereto."

Clearly, then, the Legislature intended the Commission certificate to be merely a preliminary step in the process to condemn land for an underground natural gas storage area, albeit a mandatory condition precedent. The only authority emanating from the certificate is the right to file an eminent domain action pursuant to K.S.A. 26-501 to 26-516, inclusive.

To help grasp the role of certification here, one might view the certificate as being analogous to a marriage license. Just as an entity proposing to create an underground natural gas storage area must show the Commission that it meets the statutory criteria to do so, e.g., that it is a natural gas public utility, a person proposing to enter into a marriage contract in Kansas must show a clerk or judge of the district court that he or she

46

is statutorily entitled to marry, e.g., that the person is old enough. See K.S.A. 2018 Supp. 23-2505 (provisions governing the issuance of a marriage license). Just as a certificate is a condition precedent to condemning an underground storage area, a marriage license is a condition precedent to solemnizing a marriage in this state. See K.S.A. 23-2504(a) ("Marriage may be validly solemnized and contracted in this state, after a license has been issued for the marriage."). Just as the judge in an eminent domain action can rely on the Commission certificate as prima facie evidence that the petitioner is statutorily entitled to condemn the land sought, a preacher or other person authorized to solemnize a marriage can rely on the marriage license as prima facie evidence that the parties to be joined in marriage are statutorily entitled to marry. Finally, just as the issuance of a certificate is no guarantee that the natural gas utility will carry through with condemning the new storage area, the issuance of a marriage license is no guarantee that the licensee will carry through with the wedding.

But the distinct difference I discern is that surely no one in the majority would say that the issuance of a marriage license, standing alone, invests the licensee with any of the rights and privileges of marriage. Before the process is complete, i.e., before the marriage is solemnized and the paperwork executed, a fiancé does not acquire any property or marital support interests simply by holding a license to marry. Yet, the majority invests the natural gas utility with the landowner's right to capture gas upon the issuance of a certificate—in effect, upon the issuance of a license to condemn— regardless of whether the injector ever uses the certificate to commence and complete the eminent domain procedures of K.S.A. 26-501 et seq. That concept is enigmatic. Without the order in condemnation, the certificated injector would hold the right to capture its injected gas under the landowner's property but would not have the legal right to store it there and would not have the legal right to go upon the landowner's surface to actually capture the gas. Surely, that is not what our Legislature intended. Indeed, the last time we reviewed this case, we recited the well-established canon of statutory construction that

47

we avoid unreasonable or absurd results and presume the Legislature does not intend to enact useless or meaningless legislation. *ONEOK I*, 296 Kan. at 918.

Perhaps the majority is enamored with the certification process because it includes a determination of "the amount of recoverable oil and native gas, if any, remaining" in the property proposed to be used for underground storage. K.S.A. 55-1204(a)(2). But the Legislature did not make the Commission's determination the final word on that topic. Under the eminent domain procedure of K.S.A. 55-1205, the appraisers' award in condemnation "shall also take into consideration the amounts of recoverable oil and native gas remaining in the property sought to be appropriated and for such purposes shall receive as prima facie evidence of such amounts the findings of the commission with reference thereto." In other words, the Commission's certificate as to the amount of native gas remaining under the property is not determinative; it is prima facie evidence which "'carries the inference that such evidence may be rebutted and overcome.'" *State v. Smith*, 223 Kan. 192, 194, 573 P.2d 985 (1977). The point is that the Legislature intended the respective property interests to be determined in the judicial condemnation action, not the administrative certification process.

In short, I would affirm the district court's determination that Northern was not entitled to the value of the storage gas produced from the expansion area before the March 30, 2012 date of taking in the condemnation action.

STEGALL, J., joins in the foregoing dissenting opinion.

* * *

STEGALL, J., dissenting: I agree with and join Justice Johnson's dissent. I write to provide some added color. First, I do not see much benefit in the dispute over whether *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 774 P.2d 962 (1989), was "overruled"

48

by either statute or our prior caselaw. This is because on the key point, *Union Gas* is unequivocally wrong. The *Union Gas* court held that a utility's "storage operation" on property owned by others "became authorized" on the day it received a regulatory certificate that included that land. See *Union Gas* 245 Kan. at 88. This remains the lynchpin holding relied on by today's majority. The majority recites this holding at the outset and applies it to today's case by concluding that on the "date when Northern received a certificate from the Federal Energy Regulatory Commission" the "authorized boundaries" of its storage operation were "expand[ed] . . . to encompass the offending wells." See slip op. at 3.

The majority says I have misunderstood the holding of *Union Gas* when I "assert[] *Union Gas* authorized the non-consensual storage of injected gas on the property of another." Slip op. at 18. Insisting that the holding of *Union Gas* is more modest than I suggest, the majority claims *Union Gas* "simply applied the rule of capture for extracted non-native gas under two factual scenarios—before certification and after." Slip op. at 18. I am unable to square the majority's contradictory descriptions and uses of *Union Gas*. Either a regulatory commission certificate authorizes the storage of gas within the defined boundaries or it doesn't.

Both *Union Gas* and today's majority rely on the legal conclusion that such a certificate *does* authorize the storage operation. This, in turn, serves as a basis and justification for the secondary holding that the rule of capture should not apply to gas being stored in an "authorized" field. The majority's protest that both *Union Gas* and our decision today are *merely* about the rule of capture suggests (to me) that my colleagues are uncomfortable owning up to the legal foundations of today's holding. But more importantly, as Justice Johnson's dissent makes clear, the federal certificate obtained by Northern cannot and does not "authorize"—as a matter of state law—Northern's use of someone else's real property. A legislatively sanctioned condemnation is required for that.

49

Second, any analysis of these kinds of situations—and the choices courts make when picking which rule should govern—benefits from a consideration of incentives. Here, one party or another will necessarily receive a windfall. Either the public utility will have the benefit of unauthorized gas storage, or the private property owner will realize the benefit of non-native gas production. Which rule will most effectively incentivize the prevention of this less-than-optimal circumstance? Historically, Kansas has chosen the rule of capture as the best incentive to prevent unauthorized gas migration. This makes sense because of the two parties, the public utility has greater control over the gas. (Of course, if a private party creates conditions to usurp that control, the rules may change. And while that was an allegation in this case, we have no facts or findings in the record before us substantiating that claim.)

The rule of capture incentivizes the public utility to pay attention to where its gas is physically located. The alternative incentive—permitting the private property owner to recover damages for trespass after the fact—is by comparison relatively weak. For starters, it's an after-the-fact incentive and thus suffers from a kick-the-can tendency. That is, a public utility may justify lax safeguarding of its gas (or slow prosecution of condemnation actions) by reasoning that it can just pay for the storage right later on (and only if the landowner chooses to enforce his or her rights). Indeed, this rule will actually *dis-incentivize* what the law requires—a condemnation. Why condemn at all when unauthorized storage is both free and immediate? In addition, even if the value of the unauthorized storage is ultimately paid to the landowner, the landowner has lost something that can never be recouped—the opportunity to say no to the storage operation in the first instance. I see no reason to depart from our historic and well-settled choice to apply the rule of capture in these circumstances.

Finally, our consideration of these rule choices in the realm of common law ought to be informed by a healthy dose of pragmatism. What is the best rule for the people of Kansas? In my judgment, the rule of capture has proven to be the best rule, pragmatically,

50

for *both* the management and delivery of the necessary services public utilities perform and for the protection of private landowners who happen to find themselves within migration range of such utilities.